

David A. Campbell
1375 E. 9th Street, Suite 2250
Cleveland, Ohio 44114
David.A.Campbell@lewisbrisbois.com
Direct: 216.298.1261

LEWIS BRISBOIS BISGAARD & SMITH LLP



PLAINTIFF'S
EXHIBIT

**3**

December 30, 2019

**VIA ELECTRONIC SUBMISSION AND E-MAIL**

Kimberly Nicholson
Investigator
Equal Employment Opportunity Commission
Detroit Field Office
477 Michigan Avenue
Room 865
Detroit, MI 48226
E-Mail: Kimberly.nicholson@eeoc.gov

> Re:  <u>Evelyn Williams v. Barton Marlow/ Cleveland-Cliffs HBI Plant</u>
>      EEOC No. 471-2019-04100

Dear Investigator Nicholson:

As you know, this law firm represents Respondent Barton Malow Company, misnamed in the captioned-Charge as Barton Marlow/Cleveland-Cliffs HBI Plant (the "Respondent") with respect to the captioned-Charge filed by Claimant Evelyn Williams ("Williams"). This correspondence represents Respondent's position statement in response to the Charge. If you have any follow-up questions or concerns, please direct them to me and we will promptly respond.

Williams is a union ironworker who worked for Respondent pursuant to a collective bargaining agreement. Williams had the right to grieve the issues set forth in the Charge. However, no grievances were filed on behalf of Williams during her employment with Respondent. Williams' Charge alleges sexual harassment and retaliation. As to sexual harassment, the Charge alleges that Williams was subjected to "sexual harassing language." However, the charge concedes that Respondent investigated the matter immediately upon notice and took adverse action against the alleged harasser. The Charge concedes that Respondent's actions stopped any further sexual harassment directed toward Williams. Based on Respondent's prompt and effective action, Williams' sexual harassment charge should be dismissed on a finding of no probable cause.

As to retaliation, the Charge alleges that despite Respondent's prompt response to the sexual harassment issues, that Williams was reassigned after the harassment and denied assignments. The Charge further alleges that Williams sent a certified letter detailing these allegations and Respondent discharged her upon receipt of the certified letter. Respondent

---

ARIZONA • CALIFORNIA • COLORADO • CONNECTICUT • FLORIDA • GEORGIA • ILLINOIS • INDIANA • KANSAS • KENTUCKY

LOUISIANA • MARYLAND • MASSACHUSETTS • MISSOURI • NEVADA • NEW JERSEY • NEW MEXICO • NEW YORK

NORTH CAROLINA • OHIO • OREGON • PENNSYLVANIA • RHODE ISLAND • TEXAS • UTAH • WASHINGTON • WEST VIRGINIA

Kimberly Nicholson
December 30, 2019
Page 2

strongly denies these allegations.  Respondent was given the choice of where to work following the harassment investigation.  Williams selected a new work area and she reported to management that she was happy with the assignment and Respondent's response to the sexual harassment.  As to the certified letter, the letter was sent to a third party, not Respondent.  Respondent did not receive a copy of the certified letter until after Williams was laid off for reasons wholly unrelated to the issues raised in the Charge.  Accordingly, Williams' retaliation charge should also be dismissed on a finding of no probable cause.

I.    **RELEVANT FACTS**

    A.    **Respondent Is An Equal Employment Opportunity Employer.**

Respondent's Equal Employment Opportunity Policy, Mutual Respect Policy, and Sexual Harassment Policy are attached hereto as Exhibit 1.  As you can see, Respondent's policies prohibit all forms of discrimination.  In addition, Respondent's policies prohibit all forms of harassment.  Respondent's employees are provided with complaint procedures to report harassment and discrimination.  In addition, as a union employee, Williams had access to a grievance and arbitration process under the collective bargaining agreement governing her employment with Respondent.  Respondent's policies prohibit retaliation against any employee who submits a complaint or who is involved in an investigation of harassment or discrimination.  In this matter, Respondent fully complied with its policies.

    B.    **Williams' Sought Employment With Respondent To Perform Tower Work.**

Respondent is a construction company based in Southfield, Michigan.  Respondent is involved in construction projects throughout the United States.  Williams' charge arises out of Respondent's work on a large construction project located in Toledo, Ohio.  The Toledo, Ohio project owner is Cleveland Cliffs.  In June 2017, Cleveland Cliffs announced that Toledo, Ohio would be the location of its first hot-briquetted iron ("HBI") production plant.  Respondent contracted with Cleveland Cliffs to perform certain construction work on the HBI production plant project.

Respondent has utilized members of the Ironworkers' Union (the "Ironworkers") to perform certain work on the HBI production plant project.  The Ironworkers' collective bargaining agreement is applicable to all Ironworkers performing work on the HBI production plant project.  Due to the application of the collective bargaining agreement, Williams and other Ironworkers assigned to the HBI production plant have the right to file grievances if they believe that Respondent takes wrongful conduct toward the Ironworker during the Ironworkers' employment at the HBI production plant project.  Respondent has never been advised of any grievances filed by Williams during her employment at the HBI production plant project.

The vast majority of the Ironworkers on the HBI production plant project are based in Toledo, Ohio and members of Ironworkers Local 55.  However, due to the need for qualified Ironworkers to perform work on a 260 foot tower, Respondent put out a general notice to Ironworkers inviting them to travel to the HBI production plant project in order to perform tower

Kimberly Nicholson
December 30, 2019
Page 3

work.  Williams is an Ironworker based in Cleveland, Ohio.  Williams accepted Respondent's invite to travel to the HBI production plant project in order to perform ironwork on the tower.  Williams was hired by Respondent in May 2019.  Williams was a member of the Ironworkers.

As with all Ironworkers assigned to the HBI production plant project, Williams initially attended an orientation session.  Once Williams completed her orientation, she was sent to the tower with other Ironworkers in order to complete her assigned duties.  Respondent recognized significant performance issues with Williams' work during her first shift on the tower and it was determined that Williams was not qualified to perform the ironwork on the tower.  Williams could have been laid off at that time because she could not perform the function she was hired to perform.  However, Respondent concluded that Williams and several other newly hired Ironworkers would be reassigned to another area of the project, Heat Recovery.

**C.      Respondent Learns Of Inappropriate Comments Directed To Williams.**

Williams' work performance in Heat Recovery did not improve.  Williams was installing bolts in an incorrect manner and the quality of her work was poor.  More importantly, Williams' work effort was far below Respondent's expectations.  Williams' lack of work effort resulted in a fellow Ironworker inappropriately yelling at Williams to pick up her work pace.  Williams' co-worker reported that Larry Collins, another Local 55 Ironworker, made inappropriate comments to Williams while she was operating a man lift.  Respondent was made aware of the alleged comments and an investigation was immediately conducted.  Williams, Collins, and four other witnesses were interviewed regarding the alleged comments.  Respondent ultimately concluded that Collins' comments violated Respondent's polices and his employment was terminated.  To Respondent's knowledge, Collins and Williams had no further interactions and the alleged harassing conduct stopped on Collins' discharge.

In addition to discharging Collins, Respondent required all foremen on the project to conduct professionalism training with all of the Ironworkers assigned to the HBI production plant project.  The training took place on June 11, 2019.  A copy of the sign-in sheet for the training is attached hereto as Exhibit 2.  The Ironworkers were required to attend the training session.  The training session addressed Respondent's Mutual Respect Policy, Respondent's prohibition against retaliation, Respondent's Sexual Harassment Policy, and Respondent's core values.

Williams was not required to leave the Heat Recovery department following the investigation.  Rather, following Collins' discharge, Respondent provided Williams the opportunity to decide whether she wanted to continue in the Heat Recovery department or to move to a different area of the project.  Williams made the voluntary decision to change her work location.  Following the relocation, one of Respondent's managers spoke with Williams and Williams informed the manager that she was very happy with the assignment and enjoyed working with her new crew.  Williams was also advised during this meeting that all Ironworkers would be required to attend the professionalism training on June 11, 2019.  Williams never filed a grievance regarding the reassignment or the alleged harassment.

Kimberly Nicholson
December 30, 2019
Page 4

D.    **Williams Was Laid Off Due to Lack of Work, Poor Performance, and Attendance Issues.**

Williams' foremen reported continuing work effort and performance issues during her third assignment on the HBI production plant project. The foremen also reported that Williams did not follow directives and would oftentimes self-select tasks that were not important to the project. Williams was also having attendance issues. Ultimately, in late June, Respondent made the decision that layoffs were required due to delays in the Mammoet crane. A total of four Ironworkers, including Williams, were laid off on July 1, 2019. The other Ironworkers who were selected for lay off were Matt Parsil, Galvin Saul, and Dwayne Richardson. The lay off decisions were based on whether the Ironworker was able to work on the tower, work performance, work ethic and attendance.

Williams did not file any grievances during her employment with Respondent. However, on June 28, 2019, Williams sent a letter to Cleveland Cliffs. Cleveland Cliffs did not investigate the letter. Rather, the letter was forwarded to Respondent on July 15, 2019 – two weeks after Respondent had made the decision to lay off Williams. Obviously, the letter had no relation to Respondent's decision to lay off Williams on July 1, 2019. A copy of the certified letter is attached hereto as Exhibit 3.

Williams' letter confirms her lack of knowledge and work effort. The letter alleges that she did not have sufficient work and was unaware of the tasks that needed to be completed each workday. To the contrary, every morning the Ironworkers meet, stretch and talk over the pre-task plan for the day. However, most of the work performed by the Ironworkers is repetitive and no directives are required. If Williams believed that she had no work to perform, she should have immediately reported this issue to her foreman. Respondent has no record of such reports.

## II.    <u>RESPONSE TO THE CHARGE</u>

Based on the facts set forth above, the Charge should be dismissed as a matter of law. Williams alleges that one Ironworker made inappropriate comments to her at the outset of her employment with Respondent. Respondent took prompt and effective action against this Ironworker and no further harassment took place after Respondent's actions. As to Williams' discharge, it is based on legitimate, nondiscriminatory reasons. More importantly, Williams' complaint letter was not received by Respondent until two weeks after her lay off. Accordingly, the charge lacks merit and it should be dismissed.

A.    **Plaintiff's Claim for Sexual Harassment Fails As A Matter Of Law.**

In order for Williams to satisfy her claim for sexual harassment, she must prove that (1) she is a member of a protected class; (2) she was subjected to unwelcome sexual harassment; (3) the harassment was based on her sex; (4) the harassment unreasonably interfered with her work performance and created a hostile work environment; and (5) the employer knew or should have known of the charged sexual harassment and failed to implement prompt and appropriate corrective action. *See Newton v. Ohio Dep't of Rehab. & Correction-Toledi Corr. Inst.*, 496 Fed.

Kimberly Nicholson
December 30, 2019
Page 5


Appx. 558 (6th Cir. 2012).  As to what constitutes whether harassment was unreasonable and interfered with an accuser's work performance so as to create a hostile work environment, the alleged harassment must be sufficiently severe and pervasive. *Id.*  Here, Williams cannot satisfy the fourth or fifth elements of her prima facie case.

As to the fourth element of her prima facie case, Williams alleges that the harassing conducted amounted to a single sexually suggestive comment by a co-worker.  Importantly, a single sexually suggestive comment on one occasion does not amount to severe and pervasive conduct so as to support a claim for sexual harassment as a matter of law. *See Vidovic v. Mentor City Sch. Dist.*, 921 F.Supp. 2d 775, 798 (N.D. Ohio 2013) (finding that being called a "slut", "whore", or "lesbian", and being called "Slutidjana", "Slutjana", and other names blending her first name and the word vagina were not sufficiently severe or pervasive to support a claim for gender harassment, as "these are exactly the type of comments and name-calling the United States Supreme Court has indicated do not rise to the level of severe and pervasive treatment.") (citing *Davis v. Monroe County Bd. Of Educ.*, 526 U.S. 629 (1999); *see also Easley v. YMCA of Metro. Milwaukee, Inc.*, 335 Fed. Appx. 626, 632 (7th Cir. 2009) (few gender based comments over eight month period do not amount to objectively severe or pervasive conduct); *See Bowman v. Shawnee State University*, 220 F.3d 456, 459 (6th Cir. 2000); *Starner v. Guardian Indus.*, 143 Ohio App. 3d 461 (10th Dist. 2001) (physical touching, tickling, conversations regarding breasts, and telling dirty jokes a two and one half year period was not sufficiently severe or pervasive to support a claim for sexual harassment).

As to the fifth element of Williams' prima facie case, it is undisputed that Respondent promptly investigated and terminated the alleged harasser, thereby taking prompt and appropriate corrective action.  Importantly, an employer's prompt investigation of an employee's complaints of sexual harassment precludes a plaintiff from establishing a prima facie case of harassment as a matter of law. *See Newton v. Ohio Dep't of Rehab. & Correction-Toledo Corr. Inst.*, 496 Fed. Appx. 558, 565 (6th Cir. 2012) (employer's prompt investigation of employee's complaints precluded employer from being liable for sexual harassment because "we cannot punish [an employer] if it took prompt and adequate remedial action upon reasonable notice of the creation of a hostile work environment.").  This conclusion is further bolstered by the fact that Respondent terminated the alleged harasser. *See Blankenship v. Parke Care Ctrs.*, 913 F.Supp. 1045 (S.D. Ohio 1995) (warning the alleged harasser, threatening termination, and separating the harasser and harasee was an adequate remedy by the employer as a matter of law); *Collette v. Stein-Mart, Inc.*, 126 Fed. Appx. 678 (6th Cir. 2005) (suspending alleged harasser pending an investigation and ultimately terminating the employee was a prompt and adequate remedy as a matter of law); *Perry v. Autozoners, LLC*, 954 F.Supp.2d 599 (W.D. Ken. 2013) (terminating alleged harasser was an adequate response to sexual harassment complaint).

While Respondents' prompt remedial measures preclude Williams from satisfying her claim as a matter of law, Williams' statements to Respondent saying that she was satisfied with the outcome of Respondents' actions confirm that they remedied the alleged harassment.  In addition, Williams' complaint letter does not allege any harassment allegations following the incident with Collins.  Accordingly, Respondent's actions were prompt and effective.

Kimberly Nicholson
December 30, 2019
Page 6

**B.    Williams Claim For Retaliation Fails As A Matter Of Law.**

In order for Williams to satisfy her claim for retaliation, she must prove that (1) she engaged in a protected activity; (2) the employer knew of the protected activity; (3) the employee suffered an adverse action; and (4) there was a causal connection between the adverse action and the protected activity. *See Mallory v. Noble Corr. Inst.*, 45 Fed. Appx. 463 (6th Cir. 2002).  With respect to showing a causal connection, Williams can attempt to establish temporal proximity between the request and the adverse action, or that Plaintiff was treated differently that similarly situated individuals who did not file any complaints. *Id.* (citing *Nguyen v. City of Cleveland*, 229 F.3d 559 (6th Cir. 2000).  Williams cannot satisfy the fourth element of her prima facie case.

Williams cannot show a causal connection between her protected activity and her discharge.  Williams sent her complaint letter to Cleveland Cliffs, not Respondent.  Respondent did not receive the complaint letter until after Williams was laid off.  As to the workplace comments, Respondent took prompt action, trained all employees on Respondent's policies, and verified that Williams was comfortable in the workplace.  Williams confirmed that she was happy and was having no issues.  Williams never filed a grievance and does not allege that any further sex-related comments were made in the workplace following Respondent's prompt and effective actions.  Accordingly, Respondent's actions in response to Williams' complaint does not provide a causal connection in support of retaliation.  Further bolstering the fact that Williams' complaint was not related to her discharge is the fact that Respondent discharged several Ironworkers due to a slow down of work.

Second, the only evidence offered by Williams in support of her claim for retaliation is the fact that her discharge came shortly after Williams resubmitted her complaint via certified letter.  Importantly, temporal proximity alone is not enough to prove a causal connection in support of a claim for retaliation. *See Wasek v. Arrow Energy Servs.*, 682 F.3d 463, 721-72 (6th Cir. 2012) (citing *Spengler v. Worthington Cylinders*, 615 F.3d 481, 494 (6th Cir. 2010).  However, even if temporal proximity was enough, the letter was not received by Respondent until after Williams was laid off.

Finally, Williams fails to identify a single employee who Respondent has failed to discharge in connection with layoffs, despite having performance and attendance issues.  Accordingly, Williams cannot satisfy her prima facie case for retaliation and her claim fails as a matter of law.

Assuming, *arguendo*, that Williams could satisfy her prima facie claim for retaliation, Respondent has articulated legitimate, non-discriminatory reasons for discharging Williams which she cannot prove are pretext for unlawful retaliation – poor performance, attendance, and layoffs due to slow work. *See Smith v. Allstate Ins. Co.*, No. 5:04CV2055, 2005 U.S. Dist. LEXIS 13015, *32 (N.D. Ohio June 30, 2005) (citing *Simpson v. Midland-Ross Corp.*, 823 F.2d 937, 942 (6th Cir. 1987) (reduction in force due to economic necessity and an employee's poor performance are a legitimate, non-discriminatory reason for discharge); *see also Williams v. AT&T Mobility Servs. LLC*, 847 F.3d 384, 396 (6th Cir. 2017) (poor attendance is a legitimate, non-discriminatory reason for discharge).  Accordingly, Williams' claim for retaliation fails as a matter of law.

Kimberly Nicholson
December 30, 2019
Page 7

### III.  **CONCLUSION**

Based upon the above arguments and authorities, Williams cannot satisfy her claims for sexual harassment and retaliation.  Accordingly, the Charge should be dismissed with a finding of no probable cause without the need for further investigation.  If you have any further questions, please do not hesitate to contact me.

Very truly yours,

David A. Campbell, for LEWIS BRISBOIS
BISGAARD & SMITH LLP

DAC

---

# EXHIBIT 1



# TRADES

## POLICIES AND INFORMATION





OUR CORE PURPOSE

# BUILDING with the AMERICAN SPIRIT:



# PEOPLE PROJECTS COMMUNITIES

OUR CORE VALUES

# INTEGRITY



- Making the right and fair decision in every situation
- Demonstrating consistency between words and actions
- Honoring all commitments

# PARTNERSHIP

- Working together to advance mutual interests
- Building relationships based on trust and respect
- Ensuring a highly collaborative and enthusiastic environment
- Communicating with candor and appreciating the input of others



# EMPOWERMENT



- Equipping and enabling people to deliver results
- Understanding expectations
- Acting decisively
- Demonstrating self-motivation and entrepreneurialism



**Policy No. 04**
**Revision Date:  9/03/14**

# Equal Employment Opportunity Policy

It is the policy of Barton Malow Company to observe and comply with the Civil Rights Act (Title VII) of 1964, the Federal Equal Pay Act of 1963, the Age Discrimination in Employment Act of 1967, Executive Order 11246, as amended, Section 503 of the Rehabilitation Act of 1973, as amended, and Vietnam Era Veterans Readjustment Assistance Act of 1974, as amended (38 USC 4212), the Americans with Disabilities Act of 1990, the Family and Medical Leave Act of 1993 and all subsequent laws and regulations.

Further, it is our policy to take affirmative action to hire employees without regard to race, creed, color, sex, national origin, age or handicap, including disabled veterans, and veterans of the Vietnam era, and to treat them equally with respect to compensation.  This Company will act without discrimination in all employment practices, such as employment, upgrading, testing, placement, demotion or transfer, recruitment, advertising, layoff or termination, recall, rates of pay, overtime or other forms of compensation, benefits and selection for training, including apprenticeship.  None of the Company's facilities are to be segregated, classified or limited in any way that would adversely affect the status of any employee.

Female and disabled workers will not be discriminated against due to their gender or disability.  They will be judged solely by their qualifications for the particular job, and will receive equal treatment after employment.

This Company understands that, according to Federal regulations, "a handicap is an impairment which substantially limits one or more of a person's major life activities".  In addition to recruiting, hiring and other conditions of employment, this Company will take affirmative action in training and in modifying job requirements and facilities for the physically and mentally handicapped to comply with these regulations.

This Company cooperates fully with the construction trade unions in the development of programs, including apprenticeships, to assure equal opportunity for employment in the construction trades for qualified minority, women, and handicapped persons.

In harmony with this policy, the Company will also use its best efforts to ensure that its subcontractors provide equal employment opportunity.

This policy is communicated to all company employees so that the above principles will be fully understood and carried out; to all public and private sources used in the recruitment of employees, including labor organizations, so it is fully understood that this Company is an Equal Employment Opportunity Employer and that all applicants for employment shall be referred on a nondiscriminatory basis.

Management will continue to be guided by this policy and, with the cooperation of all employees, will actively pursue the goal of equal employment throughout the company.  All officers, managers and supervisors throughout the Company and its subsidiaries are responsible for insuring compliance with this policy with respect to their subordinate employees.  Management will appropriately address any violations of this responsibility.

Employees or interested parties who may have questions or concerns about Equal Employment Opportunities may contact the Vice President of Human Resources at (248) 436-5034 or write, 26500 American Drive, Southfield, MI  48034.



**Policy No. 22**
**Revision Date:  9/03/14**

# Mutual Respect Policy

### Introduction

Barton Malow Company (the "Company") has defined its core values as Integrity, Partnership and Empowerment.  This Mutual Respect Policy (this "Policy") reinforces the importance of our values by outlining the Company's expectations for individual conduct.  It applies to all officers, directors and employees of the Company, Barton Malow Enterprises, Inc., Barton Malow Design, Inc., and their respective affiliates.

Everyone at the Company should be able to enjoy a work environment free from discrimination, including sexual harassment.  Each of us has a responsibility to maintain dignity and respect in the workplace and the Company expects each of us to communicate professionalism, strong character and respect in all encounters with each other, our clients, our contractors, our subcontractors, our vendors and the general public.

### General Harassment

Everyone at the Company is entitled to dignity and respect in the workplace.  Various laws prohibit discrimination on grounds such as race, color, religion, national origin, gender, age, marital status and disability.  Harassment of others on any of these grounds is potentially unlawful, counterproductive and demeaning and will not be tolerated at the Company.
In addition, the Company holds itself to certain standards of conduct more stringent than those mandated by law.  Thus, even if not illegal, acts are prohibited under this Policy if they harass anyone on the basis of age, color, gender, disability status, height, marital status, national origin, political persuasion, race, religion, veteran status or weight.

### Sexual Harassment

Each of us has a responsibility to maintain a workplace free of sexual harassment.  This duty includes assuring others that they are not to endure insulting, degrading, offensive or exploitive sexual treatment.  The Company will not tolerate any attitudes that encourage, tolerate or permit harassing behavior, regardless of whether such behavior is "expected in construction," "friendly horseplay" or "just joking around."  There are no exceptions.

Sexual harassment does not refer to occasional compliments of a socially acceptable nature.  Sexual harassment refers to behavior that is not welcome, is personally offensive, lowers morale and, therefore, interferes with our effectiveness in our jobs.  No one, either female or male, should be subject to unsolicited or unwelcome sexual overtures or conduct, either verbal or physical.

Sexual harassment consists of unwelcome sexual advances, requests for sexual favors or other verbal or physical conduct of a sexual nature when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting that individual, (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance, or (4) such conduct has the purpose or effect of creating an intimidating, hostile or offensive working environment.

### Reporting

Anyone who believes he or she is or has been a victim of harassment or who has observed harassment should immediately report the matter to the Vice President, Human Resources or the Vice President and General Counsel.  All complaints will be promptly investigated and remedied in accordance with this Policy and applicable law.  The Company will not allow or tolerate any retaliation or reprisal against anyone who expresses any concern about harassment.  To the extent reasonably practicable, all complaints and reports shall be kept in confidence.

### Violations

Any employee who engages in conduct that violates another's respect or dignity will bear full responsibility for his or her conduct.  Any violation of this policy will result in disciplinary action up to and including termination of employment.

### Contact

Questions concerning this policy or its intent should be directed to the Vice President, Human Resources or Vice President/General Counsel.



# Sexual Harassment Policy

Everyone at Barton Malow is expected to communicate professionalism and respect in all encounters with employees, clients, contractors and the public in general.  Everyone should be able to enjoy a work environment free from all forms of discrimination, including sexual harassment.  It is the responsibility of all of us to uphold the dignity of others.

Sexual harassment is a form of misconduct that undermines the integrity of our employee relationships.  No one, either male or female, should be subjected to unsolicited and unwelcome sexual overtures or conduct, either verbal or physical.

Everyone has a responsibility to maintain the workplace free of sexual harassment.  This duty includes assuring others that they are not to endure insulting, degrading, offensive or exploitive sexual treatment.  It is not acceptable to allow an attitude that on a construction site you should expect to see harassment and dismiss it as okay "that's to be expected in construction."  Neither is such behavior excused under the guise of "it's just friendly horseplay" or "just joking around."  There are no exceptions.

Sexual harassment does not refer to occasional compliments of a socially acceptable nature.  It refers to behavior that is not welcome, that is personally offensive, that lowers morale and that, therefore, interferes with our work effectiveness.

Sexual harassment consists of unwelcome sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting that individual, (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance, or (4) creating an intimidating, hostile, or offensive working environment.

There will be no retaliation or reprisal in any way against anyone who expresses any concern about sexual harassment.

Employees who engage in conduct that violates another's respect and dignity will bear the full responsibility for that conduct, up to and including dismissal.

Any employee who believes they are a victim of harassment should immediately report the matter to the Vice President, Human Resources.  Likewise, any employee observing harassment should immediately report the matter to the Vice President, Human Resources.  If a report is made to any other person, the matter is to be immediately directed to the Vice President, Human Resources.  All such reports are kept in confidence.

Any concerns or questions on sexual harassment should be directed to the Vice President, Human Resources at (248) 436-5034.

**Examples of Prohibited Sexual Conduct**

Sexual harassment hurts.  It hurts the victim and those who have contact with the victim.  Sexually oriented acts or sex-based conduct have no legitimate business purposes. Accordingly, the employee who engages in such conduct will be made to bear the full responsibility for such unlawful conduct.  The prohibited conducts described are examples of sexual harassment.  This is not an inclusive list.

**Physical Assaults of a Sexual Nature**

• Rape, sexual battery, molestation, or attempts to commit these assaults
• Intentional physical conduct that is sexual in nature, such as touching, pinching, patting, grabbing, brushing against another employee's body, or poking another employee's body

**Unwanted Sexual Advances, Propositions, or Other Sexual Comments**

• Sexually oriented gestures, noises, remarks, jokes, or comments about a person's sexuality, sexual experience, dating, or marriage
• Subjecting, or threats of subjecting, an employee to unwelcome sexual attention or conduct, or intentionally making performance of the employee's job more difficult because of the employee's sex
• Seeking favors in return for job related benefits such as raises or preferential treatment

**Sexual or Discriminatory Displays or Publications Anywhere in the Workplace**

• Displaying pictures, posters, calendars, graffiti, objects, promotional materials, reading materials or other materials that are sexually suggestive, sexually demeaning, or pornographic, or bringing into the work environment or possessing any such material to read, display, or view at work including placing material on any electronic devices i.e. computers, TV, Video, fax etc.



- Reading or otherwise publicizing in the work environment materials that are in any way sexually revealing, sexually suggestive, sexually demeaning, or pornographic
- Displaying signs or other materials which segregate employees by sex in any area of the workplace other than restrooms or locker/changing rooms

**Retaliation for Sexual Harassment Complaints**

- Disciplining, changing work assignments of, providing inaccurate work information to, or refusing to cooperate or discuss work-related matters with any employee because that employee has complained about or resisted harassment, discrimination or retaliation
- Intentionally pressuring, falsely denying, lying about or otherwise covering up or attempting to cover up conduct, such as that described in any item above.

**Contact**

Questions concerning this policy or its intent should be directed to the Vice President, Human Resources at (248) 436-5034.

**Revision Date:  3/02/15**

**Barton Malow**

# Substance Abuse Policy

**Purpose**

Barton Malow Company and its affiliates (collectively "Barton Malow" or "Company") have a longstanding commitment to provide a safe, healthy, productive and drug-free work environment. Recognizing that inappropriate use of alcohol and other substances pose a threat to the health and safety of Barton Malow's employees, clients, subcontractors and joint venture partners and to the security of the company's equipment and facilities, Barton Malow has adopted a substance use and abuse policy that balances its respect for individuals with the need to maintain an alcohol and drug-free environment.

**Scope**

This policy outlines the practice and procedure designed to address instances of alcohol and drug use in the workplace.
Covered Employees: This policy applies to all full-time, part-time, temporary, intern, contract and non-bargaining trade employees of Barton Malow. Bargaining trade employees will be subject to the collective bargaining agreement in effect during the relevant time period.
Contractors, Subcontractors and Joint Venture Partners: All contractors, subcontractors and joint venture partners that work on projects managed by Barton Malow will be required to have a substance abuse policy in place for their employees that is comparable to Barton Malow's policy. In the event of a conflict between policies, Barton Malow's policy will govern. This requirement will be included in all Barton Malow contracts and purchase orders.

**Definitions**

"Illegal drugs" in this policy means: (a) inhalants and controlled substances; (b) any drug which is not legally obtainable; and (c) medications containing a controlled substance, which are used for a purpose or by a person for which they were not prescribed or intended or in amounts which exceed the prescribed dosage.
"Legal drugs" are defined as prescribed drugs and over-the-counter drugs which have been legally obtained, are being used only for the purpose for which they were prescribed and/or manufactured and in the prescribed amounts, and are being used by the person for whom they were prescribed.
"Under the influence" means appearance, speech, behavior, or bodily odor which causes a superior to reasonably suspect the employee to be impaired by alcohol, illegal drugs or legal drugs.
"Impaired" is defined as:
- the deterioration of an individual's judgment and a decrease in his/her physical ability due to alcohol, illegal drugs or legal drugs; and/or
- the inability of a person to perform the essential functions of his/her job duties due to alcohol, illegal drugs or legal drugs; and/or
- having a blood alcohol level exceeding .04%; and/or
- testing positive for a legal or illegal drug that exceeds the following cut-off concentration level:
  - Amphetamines, including Methamphetamine, Ritalin, Ecstasy – 1,000 ng/ml;
  - Barbiturates – 300 ng/ml;
  - Benzodiazepines – 300 ng/ml;
  - Cannabinoid – 50 ng/ml;
  - Cocaine – 300 ng/ml;
  - Methadone – 300 ng/ml;
  - Opiates – 2,000 ng/ml;
  - Phencyclidine – 25 ng/ml.

**Prohibited Activities**

- Barton Malow employees are strictly prohibited from:
- Possessing or consuming any alcoholic beverage while: (a) on the job; (b) on Company property (except during a Company-sanctioned social function in which the Company provides or permits alcoholic beverages); (c) on client property (except during a client-sanctioned social function in which the client provides or permits alcoholic beverages); (d) in vehicles during work hours; or (e) in a Barton Malow-owned vehicle at any time.
- Engaging in the unlawful or unauthorized manufacture, distribution, dispensation, possession, sale, transfer, storage, concealment, transportation, promotion, or use of a controlled substance, illegal drug, alcoholic beverage or drug related paraphernalia.
- Reporting for work or working while under the influence of alcohol or with illegal drugs in the employee's system.
- Using a legal drug or medication: (1) without a prescription in the employee's name written by a physician; and/or (2) in amounts that exceed the dosage identified on the prescription; and/or (3) in amounts that impair the employee's ability to perform his or her job.

Such conduct is also prohibited during non-working hours to the extent that, in the opinion of the management of the Company, it:
- Impairs the employee's ability to perform his or her job.
- Affects the Company's reputation, threatens its integrity or interferes with a client relationship.  Is considered illegal and/or unlawful conduct as defined by local, state or federal law.
- Is considered illegal and/or unlawful conduct as defined by local, state or federal law.



**Authorized Testing**

- *Pre-employment testing*: All applicants will be required to pass a Company paid substance abuse test for the presence of illegal drugs before being hired by Barton Malow. The pre-employment testing applies to all applicants, whether full-time, part-time, temporary, intern, contract and non- bargaining trades.
- *Reasonable suspicion testing*: An employee shall submit to a drug test and/or alcohol test if there is reasonable suspicion or cause to suspect (including but not limited to based on the employee's appearance, speech or behavior) that the employee is under the influence of alcohol, illegal drugs or legal drugs.
- *Post-accident testing*: An employee shall submit to a drug and/or alcohol test if such employee: (1) suffers an occupational on-the-job injury; (2) is suspected of causing or contributing to a serious work accident; and/or (3) is involved in a reportable accident while operating equipment or driving a motor vehicle.
  - On-the-job injuries are defined as injuries occurring during a serious or potentially serious accident or incident where: (1) safety precautions were violated; (2) negligent or careless acts were performed; (3) the employees failed to wear prescribed personal protection equipment; and/or (4) the employee failed to follow prescribed safety rules.
  - A reportable accident is defined as: any accident which results in the death of a human being or bodily injury to a person who, as a result of the injury, immediately receives medical treatment away from the scene of the accident; or total damages to all property aggregating $1000.00 or more, based upon actual costs or reliable estimates.

*In all cases of post-accident testing, testing should be taken within eight (8) hours of the accident. It is the employee's responsibility to notify his/her supervisor of all accident and/or incidents.

- *Follow-up testing*: An employee shall submit to an unscheduled follow-up drug test or alcohol test if, within the previous 24 months, the employee has done any of the following:
  - Voluntarily disclosed a drug and/or alcohol dependence or other problem;
  - Entered into or completed a rehabilitation program for drug or alcohol abuse;  Failed or refused a drug test or alcohol test;
  - Been disciplined for violating this rule.
- *Random Testing*: Barton Malow reserves the right to randomly test its employees at any time. Selection of employees for random testing will be conducted through the use of a neutral selection process.
- *Refusal to Participate*: An individual who refuses to participate in substance abuse testing pursuant to this policy will be considered insubordinate and will be discharged.

**Testing**

- Barton Malow may test, at the identified cut-off levels, for any or all of the following:
  - Alcohol;
  - Amphetamines, including Methamphetamine, Ritalin, Ecstasy – 1,000 ng/ml;
  - Barbiturates – 300 ng/ml;
  - Benzodiazepines – 300 ng/ml;   Cannabinoid – 50 ng/ml;
  - Cocaine – 300 ng/ml;
  - Methadone – 300 ng/ml;
  - Opiates – 2,000 ng/ml;
  - Phencyclidine – 25 ng/ml.
- Applicants and employees will be given an opportunity prior to and after testing to provide any information which they consider relevant to the test, including a list of all legal drugs they have taken recently, a list of prescribed drugs and an explanation of the circumstances for the use of these drugs in writing. This information is confidential and will be only released to management.
- Barton Malow will pay the cost of the initial and confirmation drug tests it requires of employees and applicants. An employee or applicant will pay the cost of any additional drug test not required by Barton Malow.

**Penalties**

- *New Hires*: If a person given a conditional offer of employment fails or refuses to submit to the pre-employment drug test, interferes with a test procedure, or tampers with a test sample, the conditional offer of employment will be rescinded. The person is removed from all applicant pools and is disqualified from re-applying for a period of three (3) years.
- *Employee Self-Reporting*:
  - Reporting. An employee who voluntarily discloses a problem with legal drugs, illegal drugs or alcohol will not be disciplined for such disclosure if, and only if, the problem is disclosed before the occurrence of any of the following:
    - For reasonable suspicion testing, before the occurrence of an event that gives rise to reasonable suspicion that the employee has violated this rule.

BARTON MALOW COMPANY  rev. March 2017



- For random testing, before the employee is selected to submit to a drug or alcohol test.
- For post-accident testing, before the occurrence of any accident that results in post-accident testing.
- *Employer action*: For those employees who voluntarily seek help for an abuse problem,
- Barton Malow shall permit the employee an immediate leave of absence to obtain medical treatment or to participate in a rehabilitation program. Employees can use earned sick and vacation time or may be granted an unpaid leave of absence for rehabilitation. Satisfactory performance remains a requirement, even if chemically dependent employees seek medical help.
- *Limitation*: An employee may take advantage of subsection (b) no more often than one time while employed at Barton Malow.
- *Violation of Policy*: An individual who tests positive for an illegal drug or is under the influence of alcohol will be subject to disciplinary action, up to and including termination. Similarly, a second occurrence for needed rehabilitation, while a Barton Malow employee, will result in disciplinary action, up to and including termination.

**Use of Legal Drugs**

- Prescription and over-the-counter drugs are not prohibited when (a) taken in standard dosage and/or according to a physician's prescription, and (b) the employee is not under the influence of the legal drug during work hours.
- Any employee using legal drugs that may affect job performance or alter his/her behavior must consult with his/her physician regarding the effects of such legal drug use, the effects on the employee's ability to perform his/her assigned duties and whether the medication may interfere with the safe performance of his/her job. Upon reporting to work, the employee should provide his/her supervisor with written documentation to support the employee's legal drug use and fitness for duty or any restrictions imposed while taking the prescribed drug.
- If the use of a legal drug could compromise the safety of the employee, fellow employees or the public, it is the employee's responsibility to use appropriate personnel procedures (i.e. call in sick, use leave, request change of duty, notify supervisor) to avoid unsafe workplace practices. To the extent possible, the Company will make reasonable accommodations for the employee to work within his/her restrictions per the Barton Malow Return to Work Program.

- If an employee, subcontractor's employee or a joint venture partner employee tests positive on a drug test for a prescription drug or medication, said individual may not return to work without the following:
  - Evidence of a current, valid prescription for the exact prescription drug or medication written by a physician in the employee's name.
  - Any work restrictions imposed by the physician while taking said prescription drug or medication.
- No employee may be under the influence of a legal drug during work hours.

**Local Substance Abuse Screening Programs**

Certain states or municipalities may require employees to conform to specific regional substance abuse screening programs. For instance, the State of Michigan's MUST program will take precedence over Barton Malow's own Substance Abuse program. Additionally, a client's requirements, as it may pertain to substance usage on their property, will take precedence over Barton Malow's corporate policy. Bargaining trade employees will be subject to the collective agreement in place for their work at the project.

**Notification**

- *Employee Notification*: Any employee who is convicted of a criminal drug violation in the work place must notify Barton Malow in writing within five (5) calendar days of the conviction.
- *Notification to Authorities*: Barton Malow reserves the right to notify appropriate law enforcement officials regarding employees who engage in conduct and activities which violate this policy.

**Amendment to Policy**

Barton Malow reserves the right to unilaterally amend this policy at its sole discretion.

# EXHIBIT 2



**Attachment M**
**Safety Training Roster**

| Project Name: CLiffs HBI Project | Project Location: Toledo, Ohio |
|---|---|

| Course: Code of Conduct / Harassment FOREMAN TRAINING |
|---|

| Date: 6/6/2019 | Presented by: André Lamoux |
|---|---|

*This is to certify that I, the undersigned, have attended this Safety Training course and understand the contents presented during the program.*

| | Name (print) | Company Name | Signature |
|---|---|---|---|
| 1 | Darryl Williams | BMC | |
| 2 | Brad Mayer | BMC | |
| 3 | Anthony Hunley | BMC | Anthony Hunley |
| 4 | Mark Conture | BMC | |
| 5 | EARL ROUGHTON | BMC | Earl Roughton |
| 6 | Zac Sliger | BMC | |
| 7 | Josh Gore | BMC | |
| 8 | MARK Bitonti | BMC | |
| 9 | Ed Allen | BMC | Ed Allen |
| 10 | Ben Ryers | BMC | Ben Rm |
| 11 | George Whittenour | BMC | |
| 12 | Brett Derby | BMC | |
| 13 | Jeremy Wallace | BMC | |
| 14 | Mayo Alva | BMC | |
| 15 | Brandi Simon | BMC | Brandi Simon |
| 16 | Steve Shellman | BMC | |
| 17 | John Hammer | BMC | |
| 18 | Jeff Songer | BMC | |
| 19 | Keith Fuchs | BMC | |
| 20 | Dave LaVeck | BMC | |
| 21 | MARK BRAKEVELT | BMC | |
| 22 | Rob Garcia | BMC | |
| 23 | Scott Westmorland | BMC | |
| 24 | William JEFFRIES | BMC | Wm. H. Jeff |
| 25 | Romeo Rowe | BMC | |

**Attachment M**
**Safety Training Roster**

| | Project Name: CLiffs HBI | | Project Location: Toleda, OHIO |
|---|---|---|---|

Course: Code of Conduct / Harassment  Foreman Training

| Date: 6-6-2019 | Presented by: ANDRE MADDOX |
|---|---|

This is to certify that I, the undersigned, have attended this Safety Training course
and understand the contents presented during the program.

| | Name (print) | Company Name | Signature |
|---|---|---|---|
| 1 | Dean Zientek | BMC | Dean Zient |
| 2 | Clinton Combs | BMC | |
| 3 | Patrick O'Rourke | BMC | Pat O'R |
| 4 | Bryan Mackezyk | BMC | B. Mackuf |
| 5 | David Wool | BMC | |
| 6 | David Cox | BMC | David C Cox |
| 7 | Greg Ruhenrock | BMC | |
| 8 | Mark Bunce | BMC | Mark Bunce |
| 9 | Todd Masters | BMC | |
| 10 | Tom Garza | BMC | |
| 11 | Tim Tokanz | BMC | |
| 12 | | | |
| 13 | | | |
| 14 | | | |
| 15 | | | |
| 16 | | | |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |

# EXHIBIT 3

Below please find a copy of the description of what happened regarding onsite incidents pertaining to the facts about retaliation, sexual discrimination harassment, sex-based discrimination, work site situations and sex discrimination, biased employment practices.

Overview

On May 17, 2019 I was referred to a site job thru my Local Union 17, to work as a certified iron worker (Certificate No. 1343072, in Toledo, Ohio at the Cleveland Cliffs HBI, Barton Marlow, contractor - located at 330 Millard Avenue, Toledo, Ohio. I reported to this work site on May 20, 2019 to Darryl Williams, General Project Manager.

Then I proceeded to orientation where I was instructed about policies and procedures. After orientation, I met with Darryl Williams, who assigned me to a "gang" (crew). After meeting with Darryl I proceeded to my assigned work area located on a tower, 260 ft above ground to do iron work my first week. My first week working with the gang was fantastic. There was a collegial spirit wherein I could call on my co workers for assistance, if needed. In fact, I needed a tool and it was graciously provided.

The following week, I was assigned on the ground, building galvanized steel stairs. I did this for one (1) week. The stairs were needed in order to get to the higher levels of the tower. There were no problems; everybody got along.

The following week three (3), I was assigned to bolt the steel - make corrections to bolting another worker had done incorrectly. During this time period, problems started:

1. On **June 4, 2019**, I was given a partner to work with me by the name of Anthony. Our detail was to bolt up the steel and to make corrections on bolts which have been put in previously, incorrect.
2. While doing the job, an ironworker by the name of "Larry", began shouting, "you enjoying riding that joy stick?" I ignored him because I had no idea he was talking to me; so he began shouting louder, "get off that joy stick, stop riding that joy stick!"
3. I then stopped working and asked "Larry", 'is there a problem?' He replied, "I don't have a problem". I responded, 'well let me know if there is a problem.'
4. Larry began shouting "do you need some anal oil to pull the joy stick out of your ass?"
5. By then I knew I needed to report him.
6. I reported same to the project general foreman, Darryl Williams during break.
7. I returned to work after break, 15 minutes later, I was called off the steel to the front office to complete an incident report which I signed.
8. I was sent home for the rest of the day so that this incident could be investigated.

On **June 5, 2019**, I returned to work and was told to go to the gang box and get my tools by Darryl Williams. He transported me to the trailer to meet with Tom, the project manager.

1. He proceeded to inform me of the results of the investigation pertaining to the incident indicated above. As a result, the co-worker was terminated and that I was removed to be removed from the site.
2. I was transported to my car to follow Darryl Williams to the new site location, which was approximately three minutes from the original site.

3. After that, at the new site, two apprentices showed me the ropes of what type of work they are doing.
4. During lunch, project manager, Tom came to the location and inquired as to how I was doing. I replied, "the five hours I've been here seem to be okay." I was under the impression that I was gong to do the work the apprentices showed me which was being done at that site from hence forth.

On **June 10, 2019**, at the start of the shift, I was never given any tasks or details to complete. For example, at the start of the day, each individual is given a detail. So I just followed my co workers to their work areas to try to fit in. It didn't work out well because no one talked to me, and there was nothing to do. The job was full. I initiated my own work, for example, I would clear safety hazards, organizing skids with parts on them and pick up debris from the area and walkways, informing my co workers that I was available as a iron worker to do what was needed per the job description.

On June 14, 2019, I noticed that a crew was one man short and so I walked over to the three co workers to include myself on the job. I was turned away by one worker who informed me that "I don't need no help." I was persistent to help with something, so I offered to bring the needed materials closer to them. They agreed; however, one guy named "Dave" in the group, said "sure Bud … thanks dude."

Accordingly, I proceeded to carry pieces of steel closer to co workers as "Dave" watched me. As I brought the pieces over, he waited until I got six inches close to him to bend down to set the piece down – he turned his back and back and passed gas in my face, loudly in front of the other two guys, who witnessed them incident. He never apologized. I reported him to "George", the head foreman. He said that he would "talk to him" about it. From June 10 to date, I have yet to receive any detailed work.

On June 26, 2019, I called Tom on my lunchbreak, project manager and informed him to contact me and that it was very important. I have not received a call yet. I have complained to "George", head foreman at my site about this situation, retrieving trash and that I have deliberately been alienated from assignments at this site. His reply, "work is slow right now."


Evelyn Williams

*Evelyn Williams*

MS. EVELYN WILLIAMS
3263 E. Overlook Rd.
Cleveland Heights, OH 44118

D COSTANZA
7-26-19
JA (

CERTIFIED MAIL

7018 3090 0000 9326 5166

UNITED STATES
POSTAL SERVICE

1000

BARTON MAlow Headquarter
Corporate Headquarters
26500 American Dr.
Southfield MI 48034
Att: Tracy Reinhold